CA 18-179 consolidated with CA 18-169

ALBERT DOUCET, JR., ET AL.

VERSUS

CITGO PETROLEUM CORPORATION, ET AL.


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-2601
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

SYLVIA R. COOKS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John D. Saunders, and Elizabeth A. Pickett, Judges.


**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

**Pickett, J., concurs in part and dissents in part for the reasons assigned in 18-169, *Bowling v. CITGO Petroleum Corp.***


**Robert E. Landry**
**Patrick D. Gallaugher**
**Kevin P. Fontenot**
**Scofield, Gerard, Pohorelsky, Gallaugher & Landry**
**901 Lakeshore Drive, Suite 900**
**Lake Charles, LA 70601**
**(337) 433-9436**
**COUNSEL FOR DEFENDANT-APPELLANT:**
        **Citgo Petroleum Corporation**

**Craig Isenberg**

**Kyle W. Siegel**
**Joshua O. Cox**
**Barrasso Usdin Kupperman Freeman & Sarver, LLC**
**909 Poydras, 24th Floor**
**New Orleans, LA 70112**
**(504) 589-9700**
**COUNSEL FOR DEFENDANT APPELLANT:**
   **Citgo Petroleum Corporation**


 **Wells T. Watson**
**Jake D. Buford**
**Baggett, McCall, Burgess, Watson & Gaughan**
**P. O. Drawer 7820**
**Lake Charles, LA 70606-7820**
**(337) 478-8888**
**COUNSEL FOR PLAINTIFFS-APPELLEES:**
   **Albert Doucet, Jr.**
   **Debra McZeal**
   **Tommy Mumford**
   **John D. Smith**


**Richard Elliott Wilson**
**Somer G. Brown**
**Cox, Cox, Filo, Camel & Wilson, LLC**
**723 Broad Street**
**Lake Charles, LA 70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFFS-APPELLEES:**
   **Albert Doucet, Jr.**
   **Debra McZeal**
   **Tommy Mumford**
   **John D. Smith**

**COOKS, Judge.**

For the reasons assigned by this court in *Bowling v. CITGO Petroleum Corp.*, 18-169 (La.App. 3 Cir. __/__/__), ___ So.3d ___, the portion of the trial court's judgment awarding Albert Doucet, Jr., Debra Ann McZeal, Tommy Mumford and John Smith damages for the fear of developing future disease is reversed. We also reverse the trial court's finding that Tommy Mumford and John Smith were exposed to slop oil, as the evidence only showed they were exposed to the air release. In all other respects the judgment of the trial court as to these plaintiffs is affirmed.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

**CA 18-169 consolidated with CA 18-170, CA 18-171, CA 18-172, CA 18-173, CA 18-174, CA 18-175, CA 18-176, & CA 18-179**

**PATRICK BOWLING, ET AL.**

**VERSUS**

**CITGO PETROLEUM CORPORATION, ET AL.**

**Pickett, J., concurs in part and dissents in part with written reasons.**

A court of appeal will not set aside the findings of fact of a trial court unless it determines the trial court's finding were manifestly erroneous or clearly wrong. *Stobart v. State, through DOTD*, 617 So.2d 880 (La.1993). In reviewing the entire record, the appellate court must find that a reasonable factual basis does not exist for the trial court's finding and that the finding is clearly wrong (manifestly erroneous) in order to reverse a trial court finding based on factual determinations. *Mart v. Hill*, 505 So.2d 1120 (La.1987). When reviewing an issue of law, though, we review the record *de novo* to determine if the trial court's legal conclusions are correct, without deference to the trial court's findings. *Foti v. Holliday*, 09-93 (La. 10/30/09), 27 So.3d 813.

## *Causation*

CITGO argues that nine plaintiffs failed to prove that their injuries were caused by exposure to either slop oil or the air release. In addition to specific arguments about each of the nine plaintiffs, CITGO re-urges the argument it made unsuccessfully in *Bradford v. CITGO Petroleum Corp.*, 17-296 (La.App. 3 Cir. 1/10/18), 237 So.3d 648, *writ denied*, 18-272 (La. 5/11/18), namely that expert testimony is required to prove both general causation and specific causation in a toxic tort case. "General causation" refers to whether a toxic substance can cause a particular harm in the general population, while "specific causation" refers to whether the toxic substance caused a specific person's injury or condition. *Knight*

1

*v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007). This court rejected that argument. *See Bradford*, 237 So.3d at 659-660. The panel in *Bradford* found that while expert testimony is required to prove causation, it is sufficient that there is expert testimony to prove general causation and medical testimony to establish specific causation. I agree with that conclusion.

Dr. Barry Levy, a physician and epidemiologist, testified via deposition to establish general causation in this case, as he has done in numerous previous CITGO cases. Frank Parker, an industrial hygienist, also testified via deposition to establish general causation. Dr. Steve Springer, a family medicine doctor, testified as to the specific causation of each of the twenty-six plaintiffs in this case. This court went on in *Bradford*, though, to evaluate not only the medical testimony as to specific causation, but also the circumstances of the exposure as related by individual plaintiffs and evidence as to the spread of the oil slop from CITGO in the days following the release. Keeping in mind these principles, my review of the evidence provided in this case leads me to a different conclusion than the majority regarding five of the plaintiffs about whether these plaintiffs met their burden of proving specific causation.

*The Louisiana Pigment Employees*

Mr. Doucet, Ms. McZeal, Mr. Mumford, and Mr. Smith were employees of Louisiana Pigment Company when they claim they were exposed to chemicals released from CITGO. Louisiana Pigment is located to the northeast of the CITGO plant. To support their claim of exposure, these plaintiffs rely on Mr. Parker's opinion about the amount of hydrogen sulfide and sulfur dioxide released from CITGO's stacks, and a chart purporting to show the wind direction at the time of the thirteen-hour release, beginning at 3 a.m. on June 19, 2006. We note that the map and wind direction chart introduced in the record in this case, exhibit seven to Mr. Parker's deposition, has print so small as to be illegible. Further, Mr. Parker's

2

testimony indicates that the map is color-coded, yet the copy introduced into the record before us is black and white. Thus, we can rely on Mr. Parker's testimony that the wind was generally calm on June 19, 2006, and when it did blow it went from the southeast to the northwest. Exhibit 8 to Mr. Parker's deposition shows the 911 calls made that day, with most of the calls made within a mile radius of CITGO and to the northwest of the facility. Mr. Parker testified that there were no calls from the northeast of CITGO. Mr. Parker also testified that employees of Firestone Polymers, a company directly across the street from CITGO, were exposed to the air release. *See Albarado v. CITGO Petroleum Corp.*, 17-823 (La.App. 3 Cir. 5/16/18), 247 So.3d 818, where the plaintiffs were employees of Firestone Polymers.

The plaintiffs' brief argues that a plaintiff in *Bradford*, Clara Espree, was east of Louisiana Pigment when she was found to have been exposed to the air release. The majority relies on this allegation in reaching its conclusion pertaining to causation. Ms. Espree's location is not in the trial court record before us, and because in issues of fact we are confined to the evidence entered in the record before us, the majority improperly considered her location in this appeal. The specific testimony of these four plaintiffs, and of Dr. Springer about each of these four plaintiffs, must be examined to determine if there is sufficient evidence in *this* record to support the judgment of the trial court.

Albert Doucet, Jr.

Mr. Doucet testified that he was an operator at Louisiana Pigment in June 2006. Mr. Doucet testified that he was on break and remembered a strong smell. He did not remember specifically what day his exposure occurred. He remembers his eyes burning and his throat burning. He claimed at the trial that he still had headaches that would come and go. While he testified that he saw his personal doctor for his symptoms, there were no records of this appointment and Mr. Doucet does not remember when this appointment occurred. Mr. Doucet did not see any oil

3

or come in contact with any oil. Mr. Doucet did not receive any documented treatment for his injuries related to the exposure until he saw Dr. Springer on January 22, 2007.

Dr. Springer testified that Mr. Doucet suffered several days of eye pain, sore throat, nausea, and sinus irritation from exposure to chemicals, and approximately seven months of increased headaches related to exposure of either slop oil or hydrogen sulfide. Dr. Springer did not have an opinion on whether Mr. Doucet was exposed to slop oil or the air release.

The trial court found that Mr. Doucet was exposed to the air release. I find manifest error in that conclusion. There is no evidence in the record to show what day Mr. Doucet smelled the strong odor which allegedly caused his injuries. There is no contemporaneous record of Mr. Doucet seeking medical treatment for these injuries at the time he suffered them. There is no evidence he was actually at work on the day of the release. I would reverse the trial court's finding that Mr. Doucet's injuries are related to exposure to the air release from CITGO. I would also reverse the damages awarded to Mr. Doucet.

Debra McZeal

Ms. McZeal testified that she was at work at Louisiana Pigment on the day of the release. She was on a break outside when she noticed a strong smell. Her eyes started burning, her throat hurt, and she became nauseated. She retreated inside. She never saw any oil on the water or came in contact with oil. Dr. Springer treated Ms. McZeal for her injuries in August 2006. At the time of the trial, she had forgotten about her exposure in June 2006.

Dr. Springer testified that in his medical opinion, one to two days of nausea, sore throat, and eye burning, and nine months of headaches, sinus congestion, and pain related to sinus congestion were caused by Ms. McZeal's exposure to chemicals

4

from CITGO. Dr. Springer testified that he did not know the details of Ms. McZeal's exposure, except that she was at Louisiana Pigment at the time.

While the evidence is paltry, the fact that Ms. McZeal testified that she was at Louisiana Pigment "on the day of the release" constitutes sufficient evidence for the trial court to determine that she was exposed on June 19, 2006. Thus, I concur with the majority that there is no manifest error in the trial court's conclusion that Ms. McZeal was exposed to the air release on June 19, 2006.

Tommy Mumford

Mr. Mumford testified that he was working at Louisiana Pigment on the day of the release. Mr. Mumford noticed a distinct smell, and he recalled his supervisor instructing him to make sure it was not emanating from their site. He suffered some nausea, a little eye irritation, and some sinus issues as a result of the exposure. He did not come in contact with any oil or see any oil. He admitted that he had sinus trouble before the exposure that was irritated by the exposure. He did not seek medical treatment for the symptoms related to his alleged exposure.

Dr. Springer testified that he believed Mr. Mumford suffered several days of nausea, nosebleeds, and other sinus issues and more than three months of headaches as a result of exposure to chemicals released by CITGO. He testified that he never examined Mr. Mumford, though he was around when Mr. Mumford went to his office for a Pulmonary Function Test. His opinion did not include the specific exposure, slop oil or air release, to which Mr. Mumford was exposed.

The trial court found that Mr. Mumford was exposed to the slop oil and the air release. I concur with the majority's conclusion it was manifestly erroneous for the trial court to conclude that Mr. Mumford was exposed to the slop oil. Nevertheless, I agree there is sufficient evidence to support the finding that he was exposed to the air release.

5

John Smith

Mr. Smith did not smell anything out of the ordinary on the day he claims he was exposed to the chemicals released from CITGO. He only came to believe he was exposed when it became a topic of conversation at the plant. At that point, he got concerned and contacted a law firm. He claimed to have no symptoms that lasted more than a few days. Nevertheless, Dr. Springer testified that, in addition to three days of diarrhea and one to two days of nosebleed and eye irritation, Mr. Smith suffered nine months of skin irritation as a result of exposure. Dr. Springer clarified that the skin irritation would only be caused by exposure to slop oil, not to the air release. Dr. Springer also testified that he does not know if Mr. Smith was exposed to the slop oil or to the air release.

I find manifest error in the trial court's conclusion that Mr. Smith was exposed to the air release or to slop oil. Mr. Smith, by his own admission, cannot recall his exposure. I concur with the majority that there is no evidence that he was exposed to slop oil. I would reverse the judgment of the trial court finding Mr. Smith's injuries were caused by CITGO, as well as the award of damages to Mr. Smith.

*Leslie Mouton*

I agree with the conclusion reached by the majority that evidence supports the trial court's finding that Ms. Mouton was exposed to the air release.

*Yvonne Glasgo and Ricky Matthews*

CITGO argues that there is no evidence that the slop oil from CITGO reached the 210 beach, which was 3.6 miles upriver from CITGO, by June 20, 2006. The plaintiffs argue that this court, in *Bradford*, affirmed a judgment finding that four attendees of the Richard family event were exposed to slop oil, and Ms. Glasgo and Mr. Matthews were at the same Richard family event. They argue the findings of fact in *Bradford* constitute sufficient proof of exposure in this case. I disagree.

6

The plaintiffs, through their brief, reference findings of fact in *Bradford* which they argue support the trial court's findings of causation in this case. Proof of a fact in one lawsuit does not constitute proof of a fact in a totally separate suit. This court is confined to a review of the record before us as to a review of causation. The plaintiff must provide proof in <u>this</u> record that harm suffered by the plaintiffs before us was caused by the named defendant. Causation cannot be presumed. While a factual issue may be common to two suits, a court's factual determination in a suit involving one person is not res judicata or binding in another suit involving a different party or parties. *State, through Dept. of Highways*, 215 So.2d 142 (La.App. 3 Cir. 1968), citing *Knighten v. American Auto. Ins. Co.*, 121 So.2d 344 (La.App. 1 Cir. 1960); *see also* La.R.S. 13:4231 ("a valid and final judgment is conclusive between the **same** parties").

According to Harvey Yee, an employee of CITGO who was on the internal team who investigated the events of June 19, 2006, the release of slop oil into the Indian Marais, a navigable channel that flows into the Calcasieu River and is adjacent to the CITGO facility, occurred between 4:45 a.m. and 5:00 p.m. on June 19, 2006. According to a timeline attached to the deposition of Darryl O'Bryant, despite efforts to contain the spill by deploying booms, the evidence in the record before us shows that the first time there was a report of slop oil in the Calcasieu River was at 7:50 p.m. on June 20, 2006. This was several hours after Ms. Glasgo and Mr. Matthews claim to have been exposed at the 210 beach. There is no credible evidence to suggest that the slop oil traveled 3.6 miles upriver to the 210 beach during the daytime hours. The slop oil had to travel upriver to reach the beach. The only evidence in the record before us is that it reached the river late on that same day. Notably, Mr. Parker, when asked in his deposition, testified that he had no opinion about whether the slop oil reached the 210 beach on June 20, 2006. In fact,

the only evidence before us is that it was not possible for the slop oil to have reached the beach at the time the plaintiffs say they were there.

The plaintiffs point to no evidence that the slop oil reached that location except Dr. Springer's testimony that "The court in *Bradford v. CITGO* established that the Richards and Ms. Glasgo were at the 210 beach on June 20[th] and that the oil had reached that area by that time." Dr. Springer clearly solely relied on a court ruling in another case to conclude exposure, not any medical finding. This circular logic does not constitute proof of a tort. Unlike Angelina Richard in *Bradford*, there is no contemporaneous visit to the doctor to complain of symptoms. In fact, Ms. Glasgo went to the emergency room on June 22, 2006, complaining of boils on her skin, but did not make any mention of exposure to slop oil. Her first complaint of symptoms was when she saw Dr. Arimura in August 2006. Mr. Matthews first saw a physician for symptoms he alleged were related to the CITGO release of slop oil in September 2006. Mr. Matthews was also unclear on whether he was at the beach on June 19 or June 20. Mr. Matthews' records from Dr. Arimura's office state he was exposed to benzene a week after the June 19 or 20 exposure.

Given that there is no evidence in the record that the slop oil from CITGO reached the 210 beach by June 20, 2006, and in fact the evidence reflects it could not have, Yvonne Glasgo and Ricky Matthews failed to meet their burden of proving exposure to CITGO slop oil. I would reverse the judgment of the trial court to the contrary and the award of damages to Ms. Glasgo and Mr. Matthews.

*Odelia Dowling*

Ms. Dowling died before the trial of this matter, and before her deposition could be taken. The only evidence of her is exposure is her statement to Dr. Jason Morris on July 31, 2006, complaining of headaches, severe sinus congestion, severe post nasal drainage, a dry cough, and an upset stomach with intermittent bouts of diarrhea for five weeks. She told Dr. Morris that she delivered lunch to her

daughter's fiancée on June 20, 2006. Dr. Springer, who did not examine Ms. Dowling, opined that her symptoms were related to exposure of chemicals from CITGO. The trial court found she was exposed to the air release from CITGO and that exposure caused her injuries. It is undisputed, however, that the air release ended on the afternoon of June 19, 2006. The air release had completely ceased twenty hours before she was at the plant. I would find that the trial court committed manifest error in finding Ms. Dowling was exposed to the air release and in awarding damages to Ms. Dowling.

*Ellis Jack*

I concur with the majority's conclusion that Mr. Jack failed to prove causation and with the reversal of the award of damages to Mr. Jack.

## General damages for future injury

For the reasons assigned by the majority, I concur in the reversal of the award for general damages for fear of future injury to Leslie Mouton, Donald Mouton, Ebony Mouton Jack, John Thibodeaux, Tommy Mumford, Michael Colletta, and Ellis Jack. Because I find that Albert Doucet, John Smith, Ricky Matthews, and Yvonne Glasgo failed to prove exposure as outlined above, I would also reverse their awards for fear of future injury.

## General damages for fear loss of enjoyment of life

In its third assignment of error, CITGO argues that the loss of enjoyment of life damages to twenty-four of the twenty-six plaintiffs are unsupported by the evidence. The awards for loss of enjoyment of life to Mr. L'Hoste and Mr. Lambright are not challenged in this assignment of error. CITGO argues that the testimony of the remaining plaintiffs does not show that the exposure to chemicals resulted in "detrimental alterations of a person's life or lifestyle or a person's inability to participate in the activities or pleasures of life that were formerly

9

enjoyed." *McGee v. A C and S, Inc.*, 05-1036, p. 3 (La. 7/10/06), 933 So.2d 770, 774. In the plaintiffs' brief, they argue that these twenty-four plaintiffs testified about the symptoms that they suffered from as a result of their exposure to CITGO's release of chemicals, that they continued to live and work while suffering with these maladies, and that the trial court properly found they suffered a disruption in their normal quality of life. The plaintiffs also argue that it was wholly appropriate for the trial court to make general damage awards for both pain and suffering and loss of enjoyment of life, citing *McGee*. CITGO concedes that distinct general damage awards for 'pain and suffering' and 'loss of enjoyment of life' are appropriate, but only when there is sufficient proof to support each type of loss.

In *McGee*, 933 So.2d 770, 774-75, the supreme court recognized loss of enjoyment of life as an element of general damages, stating:

> La. C.C. art. 2315 authorizes a tort victim to be compensated for the damage sustained as a result of the delict, including those for loss of enjoyment of life, if proven. Moreover, this court has clearly defined general damages to include loss of enjoyment of life. Consequently, loss of enjoyment of life is a compensable component of general damages under both La. C.C. art. 2315 and this court's existing definition of general damages. Therefore, the only remaining issue is whether loss of enjoyment of life may be separated from other elements of general damages, such as mental and physical pain and suffering, and whether that separation may be reflected by having a line for loss of enjoyment of life on a jury verdict form. *See Joseph v. Broussard Rice Mill, Inc.*, 00-0628, p. 1 (La.10/30/00), 772 So.2d 94, 106-107 (Victory, J., assigning additional reasons) (stating "this Court has never squarely addressed the issue of awarding hedonic damages for loss of enjoyment of life as a separate element of damages").
>
> As established above, loss of enjoyment of life is a component of general damages and therefore loss of enjoyment of life is not separate and distinct from general damages. Nevertheless, general damages in Louisiana are routinely dissected. Courts commonly list different elements of general damages, including mental anguish and physical pain and suffering, both past and future, separately. In addition, general damages for permanent scarring and/or disfigurement are often listed separately. *See, e.g., Joseph*, 00-0628 at p. 17 (La.10/30/00), 772 So.2d at 106-107, n. 6; *Degruise v. Houma Courier Newspaper Corp.*, 95-1862, p. 9 (La.11/25/96), 683 So.2d 689, 694. Thus, allowing a separate award for loss of enjoyment of life would not offend the existing concept of general damages and would reflect the accepted method of listing elements of general damages separately.

10

Moreover, loss of enjoyment of life is conceptually distinct from other components of general damages, including pain and suffering. Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. Loss of enjoyment of life, in comparison, refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury. In contrast to pain and suffering, whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury.

This court, citing *McGee*, recently explained that a factfinder must consider the nature and severity of the injury to the plaintiff and the lifestyle he enjoyed prior to the injury when determining whether he sustained a loss of enjoyment of life. *Minton v. GEICO Casualty Co.*, 16-592 (La.App. 3 Cir. 3/8/17), 215 So.3d 290. The trial court, in its written reasons for judgment, stated that each of the plaintiffs "suffered an interruption of his normal quality of life."

This court awarded damages of $30,000.00 for loss of enjoyment of life to a plaintiff who, as a result of injuries suffered in a car accident, could not care for her aged mother, needed her son's help in doing household chores, and could no longer participate in activities she enjoyed, particularly dancing and running. *Clement v. Citron*, 13-63 (La.App. 6/19/13), 115 So.3d 1260. In *Minton*, 215 So.3d 290, this court awarded $75,000.00 for loss of enjoyment of life damages for a plaintiff who could no longer umpire or bowl as a result of his injuries, and whose activities with his grandchildren and at church were limited. In *Stutes v. Greenwood Motor Lines, Inc.*, 17-52, 17-567, 17-568 (La.App. 3 Cir. 11/22/17), 234 So.2d 75, this court affirmed an award of $6,000,000.00 for loss of enjoyment of life damages to a plaintiff rendered a paraplegic when a tractor-trailer crossed the center line and collided with his vehicle. Mr. Stutes introduced evidence that he needed assistance with his bodily functions, had little privacy, and he can no longer dress or feed himself. He also testified that he enjoyed hunting, fishing, gardening, and

woodworking before the accident. He also expressed sadness that he would not be able to play with his expected grandchild as he would have had he not been injured. Each of the plaintiffs in these three cases introduced evidence to support the award of damages for loss of enjoyment of life.

In this case, there was testimony from each of the plaintiffs about their pain and suffering related to their exposure to chemicals released by CITGO, as outlined by the majority. The trial court granted damages for pain and suffering. We can find no evidence, testimonial or documentary, to show how any one of the plaintiffs suffered a detrimental change in their lifestyle. There was no evidence adduced that any plaintiff was unable to perform any task or enjoy any pleasure or any activity before June 19, 2006, that they could not perform after their exposure to the chemical released by CITGO. In fact, what evidence that was elicited from plaintiffs shows that they did not suffer any damages related to a loss of enjoyment of life. Several plaintiffs testified that they did not miss any work because of their exposure. Only three plaintiffs specifically testified about potential loss of enjoyment of life damages. Mr. Mumford testified under cross-examination that his exposure to slop oil fumes did not interfere with daily activities outside of work. Ms. Glasgo, whose damages we reverse because she failed to prove causation, testified under cross-examination that her symptoms did not prevent her from doing any hobbies or activities. This testimony does not support a finding that these two plaintiffs are entitled to damages for loss of enjoyment of life. Mr. Daigle, during redirect examination, testified that his headaches and sinus issues for one or two months had a major impact on his life, but he did not say how. Mr. Crewell, in a deposition taken before he died, stated that he missed one day of work because of a migraine headache approximately six weeks after the exposure. This testimony, given the lack of specific details about how either of these men's lives were affected, is insufficient to support an award for loss of enjoyment of life damages.

12

I would find that of those plaintiffs who proved exposure to either the CITGO release of slop oil or of hydrogen sulfide and sulfur dioxide, the evidence presented in this record supports the claims for pain and suffering awarded to the plaintiffs. However, I find those plaintiffs failed to prove entitlement to damages for loss of enjoyment of life, and the trial court erred in making an award for loss of enjoyment of life damages. Thus, I would reverse the following monetary awards: in docket number 18-169, to Mr. Bowling, $10,000.00; to Mr. Colletta, $5,000.00; to Mr. Crewell, $10,000.00; to Mr. Daigle, $3,500.00; to Mr. Forsyth, $3,000.00; to Mr. Judice, $5,000.00; to Mr. Martin, $4,000.00; to Mr. McCoy, $10,000.00; to Mr. Paggen, $5,000.00; to Mr. Spikes, $3,500.00; to Mr. Timpa, $10,000.00; to Mr. Young, $10,000.00; in docket number 18-170, to Mr. Mouton, $3,500.00; to Ms. Jack, $5,000.00; in docket number 18-173, to Ms. Mouton, $3,500.00; in docket number 18-174, to Mr. Thibodeaux, $5,000.00; and in docket number 18-179, to Ms. McZeal, $10,000.00 and to Mr. Mumford, $5,000.00.

## CONCLUSION

As it relates to the plaintiffs in docket number 18-169, I concur that the judgment of the trial court awarding $10,000.00 to Michael Colletta for general damages for fear of developing disease should be reversed. I dissent from the majority opinion and would reverse the judgment of the trial court awarding $10,000.00 to Patrick Bowling, $5,000.00 to Mr. Colletta, $10,000.00 to Michael Crewell, $3,500.00 to Dustin Daigle, $3,000.00 to Zachary Forsyth, $5,000.00 to Chris Judice, $4,000.00 to Larry Martin, $10,000.00 to Richard McCoy, $5,000.00 to Robert Paggen, $3,500.00 to Corey Spikes, and $10,000.00 to Alton Young for general damages for loss of enjoyment of life. I would amend Mr. Timpa's damage award to $43,350.00. In all other respects, the I concur that judgment of the trial court in docket number 18-169 should be affirmed.

13

As it relates to the plaintiffs in docket number 18-170, I concur with the majority that the judgment of the trial court awarding $10,000.00 to Donald Mouton and $10,000.00 to Ebony Mouton Jack for general damages for fear of developing disease should be reversed. I dissent from the majority opinion and would reverse the judgment of the trial court awarding $3,500.00 to Mr. Mouton and $5,000.00 to Ms. Jack for general damages for loss of enjoyment of life. In all other respects, I concur that the judgment of the trial court in docket number 18-170 should be affirmed.

As it relates to the plaintiff in docket number 18-171, I dissent from the majority opinion and would reverse the judgment of the trial court finding the damages alleged by Odelia Dowling were caused by the release of hydrogen sulfide or sulfur dioxide into the air by CITGO and would reverse the damages in the amount of $13,200.00 awarded to Ms. Dowling.

As it relates to the plaintiff in docket number 18-172, I dissent from the majority opinion and would reverse the judgment of the trial court finding the damages alleged by Ricky Matthews were caused by exposure to slop oil released by CITGO and would reverse the damages in the amount of $45,732.00 awarded to Mr. Matthews.

As it relates to the plaintiff in docket number 18-173, I concur in the opinion of the majority that the judgment of the trial court finding Leslie Mouton's damages were caused by exposure to hydrogen sulfide and sulfur dioxide released into the air by CITGO. I agree that the judgment of the trial court awarding $10,000.00 to Ms. Mouton for fear of developing disease should be reversed. I dissent from the majority opinion and would reverse the judgment of the trial court awarding $3,500.00 to Ms. Mouton for general damages for loss of enjoyment of life. In all other respects, I agree that the judgment of the trial court should be affirmed.

14

As it relates to the plaintiff in docket number 18-174, I agree that the judgment of the trial court awarding $10,000.00 to John Thibodeaux for fear of developing disease should be reversed. I dissent from the majority opinion and would reverse the judgment of the trial court awarding $5,000.00 to Mr. Thibodeaux for general damages for loss of enjoyment of life. In all other respects, I agree that the judgment of the trial court should be affirmed.

As it relates to the plaintiff in docket number 18-175, I dissent from the majority opinion and would reverse the judgment of the trial court finding the damages alleged by Yvonne Glasgo were caused by exposure to slop oil released by CITGO and would reverse the damages in the amount of $23,925.00 awarded to Ms. Glasgo.

As it relates to the plaintiff in docket number 18-176, I agree with the majority that the judgment of the trial court finding the damages alleged by Ellis Jack, Jr. were caused by exposure to hydrogen sulfide or sulfur dioxide released into the air by CITGO should be reversed, as well as the damages in the amount of $27,700.00 awarded to Mr. Jack.

As it relates to the plaintiffs in docket number 18-179, I dissent from the majority and would reverse the judgment of the trial court finding the damages alleged by Albert Doucet, Jr. were caused by exposure to hydrogen sulfide or sulfur dioxide released into the air by CITGO and the damages in the amount of $35,450.00 awarded to Mr. Doucet. I dissent from the majority and would reverse the judgment of the trial court finding the damages alleged by John Smith were causes by exposure to the air release by CITGO or to slop oil released by CITGO and the damages in the amount of $45,459.00 awarded to Mr. Smith. I concur that the judgment of the trial court finding Debra McZeal's damages were caused by exposure to hydrogen sulfide and sulfur dioxide released into the air by CITGO should be affirmed. I dissent from the majority and would reverse the judgment of the trial court awarding

15

$10,000.00 to Ms. McZeal for general damages for loss of enjoyment of life. I concur with the majority in affirming the judgment of the trial court finding Tommy Mumford's damages were caused by exposure to hydrogen sulfide and sulfur dioxide released into the air by CITGO but the trial court's finding that Mr. Mumford's damages were caused by exposure to slop oil released by CITGO should be reversed. I agree with the majority opinion that the judgment of the trial court awarding $10,000.00 to Mr. Mumford for general damages for fear of developing disease should be reversed. I dissent from the majority opinion and would reverse the judgment of the trial court awarding $5,000.00 to Mr. Mumford for general damages for loss of enjoyment of life. In all other respects, I would find the judgment of the trial court should be affirmed.